167 P.3d 1264

Melvin Omar HERNANDEZ, Petitioner,

v.

The Honorable Steven P. LYNCH, Judge of the Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Judge,

The State of Arizona, ex rel. Andrew Thomas, the Maricopa County Attorney, Real Party in Interest.

No. 1 CA–SA 07–0092.

Court of Appeals of Arizona, Division 1, Department B.

Oct. 2, 2007.

Andrew P. Thomas, Maricopa County Attorney by James P. Beene, Deputy County Attorney, Phoenix, Attorneys for Respondent.

James J. Haas, Maricopa County Public Defender by Tracy Friddle, Deputy Public Defender, Amy Kalman, Deputy Public Defender, Phoenix, Attorneys for Petitioner.

## OPINION

WEISBERG, Judge.

¶ 1 Melvin Omar Hernandez ("Petitioner"), filed a special action challenging Proposition 100, a recent amendment to the bail provisions of Article 2, Section 22(A) of the Arizona Constitution. For the reasons dis-

cussed below, we accept jurisdiction and deny relief.

## BACKGROUND

¶ 2 Article 2, Section 22(A) of the Arizona Constitution sets forth several exceptions to the general presumption that persons charged with crimes are entitled to bail. Proposition 100, which was passed in the November 2006 election, added an exception for "serious felony offenses as prescribed by the legislature if the person charged has entered or remained in the United States illegally and if the proof is evident or the presumption great as to the present charge." Several months earlier, the Legislature passed a conditional amendment to Arizona Revised Statutes ("A.R.S.") section 13–3961(A) [1] (Supp.2006), which provided the following:

> A person who is in custody shall not be admitted to bail if the proof is evident or the presumption great that the person is guilty of the offense and the offense charged is either:
>
> . . . .
>
> 5. A serious felony offense if the person has entered or remained in the United States illegally. For the purposes of this paragraph, "serious felony offense" means any class 1, 2, 3 or 4 felony or any violation of § 28–1383 [aggravated driving under the influence of drugs or alcohol].

The amendment became effective upon the electorate's approval of Proposition 100. See 2006 Ariz. Sess. Laws, ch. 380, § 3 (2nd Reg.Sess).

¶ 3 On March 17, 2007, after placing Petitioner under arrest for possessing an open container of alcohol within the passenger compartment of a motor vehicle, police found a social security card and a resident alien card in Petitioner's wallet. See A.R.S. §§ 4–251(A)(2) (2006) (open container). Noticing "several discrepancies" on both cards, police conducted a records check on the social security number and found that it was not assigned to Petitioner. After he was Miran-

---

1. Section 13–3961(A) was amended on July 2, 2007. This amendment, however, does not im-

pact the issues considered here.

ized, Petitioner admitted that the cards were forged, that he had purchased them for $5,000, and that he had procured them in order to work and buy food.

¶ 4 The State charged Petitioner with two counts of knowingly possessing forged instruments with intent to defraud, a class 4 felony. A.R.S. § 13–2002(A)(2) (2006). Petitioner was released on his own recognizance after an initial appearance hearing on March 17, 2007. On April 3, 2007, however, the Arizona Supreme Court issued Administrative Order No.2007–30, which directed the superior courts to implement Proposition 100 and A.R.S. § 13–3961(A)(5) (hereinafter referred to collectively as "Proposition 100").[2] Accordingly, at Petitioner's preliminary hearing, which he attended voluntarily, the court considered whether Petitioner was entitled to bail under the new law. Based on the evidence presented by the State, the trial court concluded that Proposition 100 rendered Petitioner ineligible for bail.

¶ 5 Petitioner then filed the instant special action, but later pled guilty to solicitation to commit forgery, a class 6 felony, and was placed on probation for one year, making Proposition 100 moot to his case. One condition of Petitioner's probation was that he "[n]ot remain in or return to the United States illegally if deported or processed through voluntary departure."

**JURISDICTION**

¶ 6 We accept jurisdiction of this special action to determine whether a denial of bail pursuant to Proposition 100 is unconstitutional. Ariz. R.P. Spec. Act. 1(a); *Simpson v. Owens*, 207 Ariz. 261, 265–66, ¶ 13, 85 P.3d 478, 482–83 (App.2004). We do so because the constitutionality of Proposition 100 is an "issue that will be presented again; an issue of public notability; an issue of statewide

2. Given the mootness of Plaintiff's criminal case, discussed in ¶ 5, we will not address Administrative Order No.2007–30 further.

3. No substantive difference exists between the protection afforded under the Equal Protection and Due Process Clauses of the federal constitution, U.S. Const. amend. XIV, § 1, and the protection afforded under the state versions of the clauses, Ariz. Const. art. 2, §§ 4, 13. *See Good-*

significance; [and] an issue unresolved by the appellate court." *Simpson*, 207 Ariz. at 265–66, ¶ 13, 85 P.3d at 482–83; *State ex rel. Romley v. Rayes*, 206 Ariz. 58, 60, ¶ 5, 75 P.3d 148, 150 (App.2003). We find these reasons appropriate to accept jurisdiction over this special action even though Petitioner's subsequent plea rendered this matter moot as to him. *See Simpson*, 207 Ariz. at 265, ¶ 13, 85 P.3d at 482 (even if bail issue becomes moot, we may nonetheless consider "an issue of great public importance or an issue capable of repetition yet evading review") (citing *Phoenix Newspapers, Inc. v. Molera*, 200 Ariz. 457, 460, ¶ 12, 27 P.3d 814, 817 (App.2001)).

**ISSUES**

¶ 7 In light of Petitioner's plea, we will not address issues raised by him that are now moot, such as whether the State presented sufficient evidence of his residency status or whether Proposition 100 was unconstitutional "as applied" to the circumstances of his case. Further, we will not consider any issue that depends upon the facts of an individual case. *See also Pacific Legal Found. v. Cal. Coastal Comm'n*, 33 Cal.3d 158, 188 Cal.Rptr. 104, 655 P.2d 306, 314 (1982) ("Judicial decision-making is best conducted in the context of an actual set of facts ...."). Such fact-specific issues must abide future decisions. Instead, we will resolve the following issues that do not depend upon specific facts, yet are of statewide importance and likely to recur:

1) Whether Proposition 100 applies to those persons who have entered or remained in the United States illegally but are now lawful residents; and

2) Whether Proposition 100 is facially unconstitutional under either the Equal Protection or Due Process Clauses of the United States Constitution.[3]

*man v. Samaritan Health Sys.*, 195 Ariz. 502, 509–10, n. 10, 990 P.2d 1061, 1068–69 n. 10 (App.1999) (purported violations of federal and state Equal Protection clauses are analyzed identically); *State v. Farley*, 199 Ariz. 542, 544–45, ¶ 12, 19 P.3d 1258, 1260–61 (App.2001) (federal and state guarantees of due process are similar, if not identical). Also, even in the event the Arizona provisions provided additional protections, Proposition 100 would control because it is

## STANDARD OF REVIEW

¶ 8 In reviewing a challenge to an amendment to the Constitution, a court is obliged to effectuate the intent of those who framed the provision and, in the case of a [constitutional referendum], the intent of the electorate that adopted it. *Calik v. Kongable*, 195 Ariz. 496, 498, ¶ 10, 990 P.2d 1055, 1057 (1999) (citation omitted). A facial constitutional challenge requires an inquiry into whether the law itself is unconstitutional, not into whether the application of the law violates a particular individual's rights. *See, e.g., Robinson v. City of Seattle*, 102 Wash. App. 795, 10 P.3d 452, 458 (2000). In pursuing such an inquiry, we follow the standard set forth in *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), which held that to successfully challenge the facial validity of a regulation, the party challenging the provision must demonstrate that no circumstances exist under which the regulation would be valid. *Phelps Dodge Corp. v. Ariz. Elec. Power Co-op., Inc.*, 207 Ariz. 95, 106, ¶ 29, 83 P.3d 573, 584 (App.2004) (citing *Reno v. Flores*, 507 U.S. 292, 301, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993)).

¶ 9 We note, however, that critics of *Salerno* suggest adopting a less-restrictive standard: the large fraction test. This test is based on *Planned Parenthood of Se. Pennsylvania v. Casey*, which held that an abortion law is unconstitutional if, "in a large fraction of the cases in which [it] is relevant, it will operate as a substantial obstacle to a [recognized liberty interest]." 505 U.S. 833, 895, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992);

*see also Planned Parenthood of S. Ariz. v. Lawall*, 180 F.3d 1022, 1025 (9th Cir.1999) (*Salerno* formulation inapplicable to an abortion law); *A Woman's Choice–East Side Women's Clinic v. Newman*, 305 F.3d 684, 687 (7th Cir.2002); *see also City of Chicago v. Morales*, 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (asserting that *Salerno* formulation has never been the decisive factor in any decision of this Court). But, despite the criticism of *Salerno*, it has never been expressly overruled by the United States Supreme Court.[4] We therefore apply it in deciding whether Proposition 100 is facially unconstitutional.

## DISCUSSION

¶ 10 We first address a central premise of Petitioner's facial constitutional challenge: the phrase entered or remained in the United States illegally as used in Proposition 100 encompasses all persons who have entered the United States illegally, or at one time remained here illegally, even if they have subsequently acquired lawful residency status or citizenship.

### "Entered or Remained in the United States Illegally"

¶ 11 Petitioner argues that the phrase "entered or remained in the United States illegally" *could* be read to include persons who were once illegal aliens but have subsequently "legalized" their residency status, either by obtaining lawful permanent residency or United States citizenship.[5] *See, e.g.,* 8 U.S.C. §§ 1182, 1255. At oral argument the

---

more specific and more recent. *Denton v. American Family Care*, 190 Ariz. 152, 157, 945 P.2d 1283, 1288 (1997).

4. In acknowledging the criticism of the Salerno formulation by a plurality of Justices in *City of Chicago v. Morales*, 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999), the Ninth Circuit commented that another plurality of Justices [wa]s equally adamant that Salerno was the correct standard in every context, with the exception of certain First Amendment cases. *S.D. Myers, Inc. v. City and County of San Francisco*, 253 F.3d 461, 467–68 (9th 2001) (citing *Stenberg v. Carhart*, 530 U.S. 914, 1018–19, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000)) (Thomas, J., dissenting, joined by two Justices); *see Rodriguez de*

*Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.). This controversy, however, is not determinative here because Petitioner has neither argued nor offered evidence that Proposition 100 would be facially unconstitutional in a large fraction of cases. *See Casey*, 505 U.S. at 895, 112 S.Ct. 2791.

5. At oral argument, Petitioner conceded that this interpretation would be unreasonable.

State asserted that, even assuming this interpretation was correct, it did not violate equal protection or due process. We, however, disagree with that interpretation. For the reasons discussed below, we conclude that the phrase "entered or remained in the United States illegally" does not encompass persons who enjoy lawful residency status or citizenship at the time they seek bail.

¶ 12 Petitioner correctly points out that the phrase "entered or remained in the United States illegally" is ambiguous because it could encompass any of the following: 1) persons who entered the country illegally and remain illegally; 2) persons who entered legally but remain illegally, *e.g.*, aliens who violate the terms of their visas; and 3) persons who entered illegally but who remain legally because they have acquired lawful residency status or citizenship. *See Stein v. Sonus USA, Inc.*, 214 Ariz. 200, 201, ¶ 3, 150 P.3d 773, 774 (App.2007) (statute is ambiguous if there is uncertainty about meaning or interpretation of its terms or if its text allows for more than one rational interpretation).

¶ 13 Although the phrase "entered or remained in the United States illegally," if taken literally, could include persons who entered the country illegally but who have since acquired lawful residency status or citizenship, we "must reject a literal statutory construction that would result in an absurdity and defeat the purpose of the statute to be construed." *State v. Estrada*, 197 Ariz. 383, 387, ¶ 20, 4 P.3d 438, 442 (App.2000); *see Fragoso v. Fell*, 210 Ariz. 427, 430, ¶ 7, 111 P.3d 1027, 1030 (App.2005) (statutes and rules are to be interpreted in accordance with the intent of the drafters). Interpreting Proposition 100 as disregarding a person's current residency status or citizenship would frustrate its purpose and lead to absurd and potentially unconstitutional results. *See State ex rel. Thomas v. Klein*, 214 Ariz. 205, 207, ¶ 5, 150 P.3d 778, 780 (App.2007) (when constitutionality of provision is challenged, "we presume that [it] is constitutional, and the party challenging its validity bears the burden of establishing that the legislation is unconstitutional; any doubts are resolved to the contrary"); *Bussanich v. Douglas*, 152 Ariz. 447, 450, 733 P.2d 644, 647 (App.1986)

("When the constitutional language is ambiguous or when a construction is urged which would result in an absurd situation, the court may look behind the bare words of the provision in order to determine the conditions which give rise to it and the effect which it was intended to have.").

¶ 14 To begin, we are instructed to interpret statutes, if possible, as constitutional. *Schecter v. Killingsworth*, 93 Ariz. 273, 282, 380 P.2d 136, 142 (1963) ("Where differing constructions of a statute are possible, it is our duty to construe it in such a manner that it will be constitutional.") (citing *State v. A.J. Bayless Markets, Inc.*, 86 Ariz. 193, 342 P.2d 1088 (1959)); *Blake v. Schwartz*, 202 Ariz. 120, 122, ¶ 10, 42 P.3d 6, 8 (App.2002) ("If possible, this court has a duty to construe a statute so that it will be constitutional.") (citing *State v. McDonald*, 191 Ariz. 118, 120, ¶ 11, 952 P.2d 1188, 1190 (App.1998)). Of course, to meet substantive due process requirements, Proposition 100 must be regulatory rather than punitive. *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ("In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law … the proper inquiry is whether those conditions amount to punishment of the detainee. For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.") If the denial of bail were used to punish the past acts of those who illegally entered or remained in the United States, but subsequently gained legal residency or citizenship status, it would act as punishment for those past acts rather than serve the regulatory purpose of ensuring a defendant's presence at trial. *Salerno*, 481 U.S. at 747, 107 S.Ct. 2095 (holding, in part, that Bail Reform Act did not violate substantive due process because its purpose was not to punish detainee before trial); *Bell*, 441 U.S. at 539 n. 20, 99 S.Ct. 1861 ("Retribution and deterrence are not legitimate nonpunitive governmental objectives.") That result would be punitive and thereby violate the requirements of substantive due process. *Bell*, 441 U.S. at 535, 99 S.Ct. 1861 ("[I]f a restriction or condition is

not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted. . . ."). Therefore, our interpretation of Proposition 100 as not impacting legal alien residents or citizens is both reasonable and consistent with the stricture that, when possible, Arizona statutes are to be construed in a manner consistent with constitutional imperatives.

¶ 15 Next, the legislative history of Proposition 100 provides ample reasons to reject such a literal interpretation. For example, House Representative Russell Pearce, a sponsor of Proposition 100 and similar legislation, explained to the House Judiciary Committee that the bill "concerns a person who commits a serious felony *while in this country illegally*," and that "[i]t deals with *illegals* who commit serious crimes," given that "an *illegal individual* who commits a serious crime is a flight risk." Meeting Minutes, Committee on Judiciary, H.B. 2389, H.C.R.2028 (Jan. 27, 2005) (emphasis added). Neither Representative Pearce nor any other official commenting on the proposed constitutional amendment referred to the possible application of Proposition 100 to a person's *former* illegal residency status. Thus, as even critics of the legislation have conceded, the bill "singles out people who *are* in this country illegally." *Id.* (emphasis added). Indeed, the Senate Fact Sheets of both Proposition 100 and the accompanying statutory amendment to A.R.S. § 13–3961 indicate that the Legislature was concerned with problems arguably caused by illegal immigration and undocumented immigrants, not with persons who had acquired lawful residency status or citizenship. *See* Senate Fact Sheet, H.C.R. 2028 (May 10, 2005); Senate Fact Sheet, H.B. 2580 (May 4, 2006).

¶ 16 The materials provided to the electorate also reflect that Proposition 100 was intended to apply only to persons of unlawful residency status, and not to those who entered the country illegally and subsequently legalized their presence here. Accordingly, the 2006 Ballot Proposition Voter's Guide (the "Guide") to Proposition 100 contained various arguments by its supporters, such as Representative Pearce, who noted, that "[w]ith few real ties to the community and often completely undocumented by state agencies, many illegal aliens can easily escape prosecution for law breaking simply because they are so difficult to locate." 2006 Ballot Proposition Voter's Guide (statement of House Representative Russell Pearce), *available at* http://www. azsos.gov/election/2006/Info/PubPamphlet/english/Prop100.htm (last visited Sept. 4, 2007). Representative Pearce reasoned that the proposition was necessary because, among other things, "*illegal aliens* that commit a crime are an extremely difficult challenge for law enforcement and growing threat to our citizens" and because "[a]llowing an *illegal immigrant* to post bail simply gives them time to slip across the border and evade punishment for their crimes." *Id.* (emphasis added). Similarly, the Arizona Farm Bureau commented that "[i]f a person *has no legal right to be in this country* and commits a serious crime for which they must answer, we do not think bail is a prudent choice. . . . We ask you: When is an *undocumented person*, who is accused of a serious crime, not a flight risk?" *Id.* (statement of Arizona Farm Bureau) (emphasis added). In the same vein, Maricopa County Attorney Andrew Thomas noted that: "*Illegal immigrants* accused of committing serious felonies in Arizona should not be allowed to make bail and flee the country before standing trial for their crimes." *Id.* (statement of Andrew Thomas) (emphasis added). Critics of Proposition 100 likewise presumed that it would be applicable only to those whose residency status was unlawful, noting that the proposition "would deny the constitutional right to post bail to people accused of most felony offenses based on nothing more than their inability to prove *current* immigration status." *Id.* (statements of Jim Fullin, Matt Green, and Margot Veranes) (emphasis added).

¶ 17 In light of the foregoing, we reject the argument that "entered or remained in the United States illegally" includes those who once entered or remained within the United States illegally but now enjoy lawful residency status or citizenship. We, therefore, ana-

lyze Petitioner's facial constitutional challenge accordingly.

## Equal Protection

¶ 18 Petitioner argues that Proposition 100 violates equal protection rights because it treats illegal aliens charged with class 1–4 felonies differently than other classes of defendants seeking bail. *See* U.S. Const. amend. XIV, § 1; Ariz. Const. art. 2, § 13; *see Baxstrom v. Herold*, 383 U.S. 107, 111, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966). We, however, will not subject Proposition 100 to an independent equal protection analysis. Such an analysis is unnecessary because its result will be identical to the result of the inquiry we must undertake to determine whether Proposition 100 comports with due process. *See, e.g., Buckley v. Valeo*, 424 U.S. 1, 93, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment."); *Munoz v. Sullivan*, 930 F.2d 1400, 1404–05 (9th Cir.1991) (rational basis analysis identical under equal protection and due process). We therefore will test the constitutionality of Proposition 100 under due process considerations only. *See, e.g., Demore v. Kim*, 538 U.S. 510, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003); *Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697; *Simpson*, 207 Ariz. 261, 85 P.3d 478.

## Substantive Due Process–General Considerations

■ ¶ 19 We now turn to Petitioner's argument that Proposition 100 violates due process. Due process protects all persons present in this country—including illegal aliens—from unjustified and unfair governmental interference with fundamental rights. *See* U.S. Const. amend. XIV, § 1 ("nor shall any State deprive any person of life, liberty, or property, without due process of law"); Ariz. Const. art. 2, § 4; *see Zadvydas v. Davis*, 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (illegal aliens entitled to due process). Petitioner argues that Proposition 100 violates substantive due process guarantees because it is intended to *punish* illegal aliens and because it is *excessive* in terms of the class of persons it affects and the types of offenses it encompasses.[6] We, however, conclude that Proposition 100 is a legitimate regulatory provision ensuring that illegal aliens accused of certain serious felonies appear to stand trial and that it does not cast an unreasonably wide net. *See Simpson*, 207 Ariz. at 269, ¶ 23, 85 P.3d at 486.

■ ¶ 20 A defendant's right to freedom, which permits him to prepare a defense and prevents the infliction of punishment prior to possible conviction, may be conditioned upon the defendant "giving adequate assurance that he will stand trial and submit to sentence if found guilty." *Stack v. Boyle*, 342 U.S. 1, 4, 72 S.Ct. 1, 96 L.Ed. 3 (1951). The modern practice of requiring that a defendant post a bail bond or deposit a sum of money subject to forfeiture was instituted as a regulatory method to ensure the defendant's presence at trial. *Id.* at 5, 72 S.Ct. 1. Yet, even in colonial times, the government's right to deny bail was recognized in cases where a defendant was more likely to flee than to face trial. *See, e.g., Simpson*, 207 Ariz. at 267–68, ¶¶ 18–21, 85 P.3d at 484–85; *see also Carlson v. Landon*, 342 U.S. 524, 545, 72 S.Ct. 525, 96 L.Ed. 547 (1952) (recognizing that bail itself is not a fundamental constitutional right); *accord Rayes*, 206 Ariz. at 61, ¶ 9, 75 P.3d at 151. Over time, state and federal governments enacted provisions that defined and limited the circumstances warranting a denial of bail, expanding it from likely flee situations to include other circumstances, such as when pretrial release could subject the community to danger, *see, e.g., Simpson*, 207 Ariz. at 269, ¶ 25, 85 P.3d at 486, or when there is "a serious risk that [the

---

6. Due process contains both a substantive and procedural component. *See Simpson*, 207 Ariz. at 267, ¶ 17, 85 P.3d at 484. A substantive due process inquiry examines the justification for a law that interferes with fundamental liberty rights. *Id.* A procedural due process inquiry, on the other hand, examines whether "permissible governmental interference [with such rights] is fairly achieved." *Id.; Salerno*, 481 U.S. at 746, 107 S.Ct. 2095. As earlier noted, Petitioner's release from custody renders his procedural due process claim moot. *Simpson*, 207 Ariz. at 265, ¶ 13, 85 P.3d at 482.

freed defendant] will obstruct or attempt to obstruct justice." 18 U.S.C. § 3142(f)(2)(B).

¶ 21 Courts considering such limiting provisions have found them to comport with due process. *See, e.g., Carlson,* 342 U.S. at 545, 72 S.Ct. 525; *Simpson,* 207 Ariz. at 269, ¶ 25, 85 P.3d at 486; *see also State v. Garrett,* 16 Ariz.App. 427, 428–29, 493 P.2d 1232, 1233–34 (1972) ("Whether or not one charged with a felony is to be admitted to bail, or, if bail is fixed, what amount is reasonable, are normally questions solely for the state to decide."). In *Salerno,* for example, the United States Supreme Court upheld the federal Bail Reform Act of 1984, which permitted, among other things, "a federal court to detain an arrestee pending trial if the Government demonstrates by clear and convincing evidence after an adversary hearing that no release conditions 'will reasonably assure ... the safety of any other person and the community.'" 481 U.S. at 741, 107 S.Ct. 2095 (citation omitted). Although this provision of the Act represented "sweeping changes in both the way federal courts consider bail applications and the circumstances under which bail is granted," the Court determined that it withstood substantive due process scrutiny. *Id.* at 742, 107 S.Ct. 2095.

¶ 22 In approving additional governmental interests that would justify the denial of bail, the United States Supreme Court did not suggest that bail could not be denied in circumstances consistent with its traditional purpose, which is to ensure that a defendant will "stand trial and submit to sentence if found guilty." *Stack,* 342 U.S. at 4, 72 S.Ct. 1; *see Bell,* 441 U.S. at 534, 99 S.Ct. 1861 (there is no doubt "the Government has a substantial interest in ensuring that persons accused of crimes are available for trials and, ultimately, for service of their sentences, or that confinement of such persons pending trial is a legitimate means of furthering that interest").

¶ 23 Recently, the United States Supreme Court has twice considered statutes involving the right of the government to detain aliens subject to removal from the country. In 2001, the Court reviewed a statute that authorized the detention of certain groups of aliens who remained in the country within ninety days after a final order of removal had been entered against them. *Zadvydas,* 533 U.S. at 682, 121 S.Ct. 2491. The Government argued that the statute did not violate due process even though it set no limit on the length of time that such an alien could be detained. *Id.* at 689, 121 S.Ct. 2491. However, holding that Congress's plenary power to create immigration law was subject to constitutional limitations, the Court explained that "an alien's liberty interest is, at the least, strong enough to raise a serious question as to whether ... the Constitution permits detention that is indefinite and potentially permanent." *Id.* at 696, 121 S.Ct. 2491 (citation omitted). Thus, in order to avoid invalidating the statute, the Court narrowly interpreted it to contain an implicitly reasonable time limitation, such that detention was authorized only for the length of time reasonably necessary to secure the aliens' removal. *Id.* at 682, 121 S.Ct. 2491.

¶ 24 In the second case, the Court, without modification, upheld a statute that denied bail to defined classes of deportable aliens who were subject to removal from the country because they had been convicted of serious crimes. *Demore,* 538 U.S. at 513, 123 S.Ct. 1708; 8 U.S.C. § 1226(c). Unlike the statute in *Zadvydas,* the statute in *Demore* authorized the detention of the subject class of aliens *prior* to their removal proceedings. 538 U.S. at 513, 123 S.Ct. 1708.

¶ 25 The petitioner in *Demore,* Hyung Joon Kim, was a lawful permanent resident of the United States for over twenty years who became deportable after he had been convicted of certain qualifying crimes. *Id.* at 513, 123 S.Ct. 1708; 8 U.S.C. § 1226(c)(1)(B). Although Kim's crimes were non-violent and "rather ordinary," no bond hearing was permitted before his removal proceeding. 538 U.S. at 514–19, 123 S.Ct. 1708. Rather, because Kim became deportable by virtue of the crimes he had committed, the federal statute made him ineligible for bail. *Id.* at 513–14, 123 S.Ct. 1708; *see* 8 U.S.C. §§ 1226(c)(1)(B), 1227(a)(2)(A).

¶ 26 Kim filed a petition for a writ of habeas corpus, arguing that the statute violated due process because it denied him bail without a "determination that he posed ei-

ther a danger to society or a flight risk." *Demore*, 538 U.S. at 514, 123 S.Ct. 1708. The Court, however, disagreed with Kim, concluding that the statute complied with the requirements of substantive due process. *Id.* at 528, 123 S.Ct. 1708. In reaching its conclusion, the Court examined the statute's legislative history and purpose, the governmental interest it served, and the relatively brief six-month period of detention that it imposed. *Id.* at 518–19, 529–31, 123 S.Ct. 1708.

¶ 27 In reviewing the legislative history and purpose of the statute, including various Congressional studies, the Court concluded that the statute "necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed." *Id.* at 528, 123 S.Ct. 1708. The Court further noted that "when the Government deals with deportable aliens, the Due Process Clause does not require it to employ the least burdensome means to accomplish its goal." *Id.* The Court emphasized the relatively brief period of detention that the statute imposed compared to the potentially limitless period of detention of the statute considered in *Zadvydas*. *Id.* at 528, 123 S.Ct. 1708. Finally, the Court noted that the detention under the statute bore a reasonable relation to the purpose for which the individual was committed. *Demore*, 538 U.S. at 527, 123 S.Ct. 1708. In light of such considerations, the Supreme Court ruled that the approach taken by the statute, which categorically denied bail to certain deportable aliens rather than hold individualized bond hearings, was constitutional. *Id.* at 531, 123 S.Ct. 1708.

¶ 28 Petitioner, however, argues that the *Demore* opinion does not apply to Proposition 100 because *Demore* was an immigration case and courts give greater deference to Congress on immigration issues. We disagree that *Demore* is so limited. First, as discussed above, the Supreme Court in *Zadvydas* clearly held that Congress's plenary power over immigration was subject to con-

stitutional limitations. *Zadvydas*, 533 U.S. at 695, 121 S.Ct. 2491. Here, Proposition 100 is subject to those same constitutional limitations. Second, the Court's language in *Demore* is not limited to immigration cases, and was recently followed outside of the immigration setting in *United States v. Strong*, 489 F.3d 1055 (9th Cir.2007).

¶ 29 In *Strong*, the criminal defendant was found incompetent to stand trial and was thus committed to the custody of the Attorney General for treatment pursuant to a federal commitment statute. *See* 18 U.S.C. § 4241(d). The defendant objected and argued that the statute was unconstitutional because it required mandatory commitment without allowing the trial court to assess his individual circumstances. The defendant also argued that *Demore* only applied to aliens [7] in the context of immigration. The *Strong* court, however, held that *Demore* applies beyond the area of immigration. It concluded that the federal commitment statute was constitutional because, like the statute in *Demore*, it provided for "detention of a limited duration," which was reasonably related to the purposes of the defendant's detainment. *Id.* at 1062–63.

¶ 30 We agree with the *Strong* court that *Demore* applies beyond the narrow confines of federal immigration legislation. Therefore, to determine whether Proposition 100 complies with substantive due process requirements, we now consider whether its history and purpose, avowed governmental interests, and imposed periods of detention are acceptable.

*Legislative History and Purpose of Proposition 100*

¶ 31 Petitioner argues that Proposition 100 is not merely a regulatory procedure but inflicts punishment without due process. In *Bell*, 441 U.S. at 537–38, 99 S.Ct. 1861 the Supreme Court held that to determine the "distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may," the crucial inquiry is

---

7. We are here considering the even narrower class of illegal aliens, although as the subject of

state legislation rather than federal.

whether "the relevant disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." The legislative history of Proposition 100 and the Guide presented to voters reflect that it was not intended to punish illegal aliens but rather as a means to prevent illegal aliens from fleeing prior to trial.

¶ 32 For example, the Senate Fact Sheet on Proposition 100 explained that it was intended to supplement other regulatory exceptions to bail enacted in Article 2, Section 22 of the Arizona Constitution. The regulatory nature of Proposition 100 was further evident in the background section of the Fact Sheet, which stated the following:

> Current statute articulates the purpose of bail and any conditions of release as assuring the appearance of the accused, protecting against the intimidation of witnesses and protecting the safety of the victim, any person or the community. There are certain situations, such as if the accused is a flight risk or poses a danger to the community, in which that person will not be admitted to bail.

Fact Sheet H.C. R.2028. Such language indicates Proposition 100 was intended to define circumstances presenting an enhanced risk of flight and deny bail accordingly.

¶ 33 The legislative committee discussions also reflect the regulatory purpose behind Proposition 100. One of the sponsors of Proposition 100, Representative Russell Pearce, commented to the House Judiciary Committee that Proposition 100 was necessary because, among other things, "an illegal individual who commits a serious crime is a flight risk" and "one of the elements of being a flight risk is not knowing who the person is and where they live." *Illegal Aliens; Violent Crimes; Bail: Minutes on H.B. 2389 and HCR 2028 before H. Comm. on the Judiciary, supra* ¶ 15.

¶ 34 Finally, the Guide provided to voters during the November 2006 election reflects that Proposition 100 was presented as a regulatory measure, rather than a punitive one.

In the Guide, supporters noted, among other things, the following:

> Allowing an illegal immigrant to post bail simply gives them time to slip across the border and evade punishment for their crimes.
>
> . . . .
>
> The Honorable Russell Pearce, Arizona House of Representatives, Mesa
>
> . . . .
>
> Far too many illegal immigrants accused of serious crimes have jumped bail and slipped across the border in order to avoid justice in an Arizona courtroom ... the Arizona Constitution now denies bail to defendants accused of rape and child molestation. This proposition similarly would deny bail to illegal immigrants who pose a clear danger to society and who too often use our border as an escape route.
>
> . . . .
>
> Andrew Thomas, Maricopa County Attorney, Phoenix
>
> . . . .
>
> We ask you: When is an undocumented person, who is accused of a serious crime, not a flight risk?
>
> . . . .
>
> Kevin Rogers, President, Arizona Farm Bureau, Mesa
>
> . . . .
>
> [A] large number of [ ] wanted fugitives from justice are illegal aliens who have fled to their native country as a means of avoiding prosecution and conviction for their crimes ... prosecuting attorneys have asked the court to retain custody of these fugitives because of the flight risk only to have judges ignore that risk and set bail.
>
> . . . .
>
> Don Goldwater, Goldwater for Governor, Laveen

*See* 2006 Ballot Proposition Voter's Guide (Arguments "For" Proposition 100).

¶ 35 In light of its legislative history and background, we hold that the purpose behind Proposition 100 was not to punish illegal aliens, but to prevent them from fleeing before trial.[8]

---

8. This conclusion is bolstered by our earlier con-    clusion that Proposition 100 does not apply to

*Governmental Interest*

¶ 36 As explained above, the governmental interest behind Proposition 100, i.e., preventing defendants from fleeing prior to trial, is the traditional purpose of bail. *See, e.g., Bell,* 441 U.S. at 534, 99 S.Ct. 1861 (there is no doubt the "Government has a substantial interest in ensuring that persons accused of crimes are available for trials and, ultimately, for service of their sentences, or that confinement of such persons pending trial is a legitimate means of furthering that interest"). Early colonial versions of bail provisions, for example, denied bail to those charged with capital crimes "in large part because of the supposition that the accused would flee to save his life even if bail were posted." *Simpson,* 207 Ariz. at 267, ¶ 18, 85 P.3d at 484.

¶ 37 *Demore* explicitly accepted the reasonable determination that aliens subject to deportation may pose an increased flight risk and consequently be subject to pretrial detention. *See* 538 U.S. at 528, 123 S.Ct. 1708; 8 U.S.C. § 1227(a); *see Coelho v. Gonzales,* 452 F.3d 104, 106–07 (1st Cir.2006) (alien who remained longer than permitted was removable under 8 U.S.C. § 1227(a)(1)(B)). In ruling that the challenged federal statute did not violate substantive due process, the Court cited studies indicating the Government's "wholesale failure ... to deal with increasing rates of criminal activity by aliens;" the Government's trouble locating and identifying most deportable aliens; and, a report reflecting that "[o]nce released, more than 20% of deportable criminal aliens failed to appear for their removal hearings." *Demore,* 538 U.S. at 518–19, 123 S.Ct. 1708.

¶ 38 Just as in *Demore,* Proposition 100 reflects that our electorate and Legislature "perceived pretrial detention as a potential solution to a pressing societal problem." *Salerno,* 481 U.S. at 746, 107 S.Ct. 2095; *Demore,* 538 U.S. at 528, 123 S.Ct. 1708; *see also Day–Brite Lighting, Inc. v. Missouri,* 342 U.S. 421, 423, 72 S.Ct. 405, 96 L.Ed. 469 (1952) ("Our recent decisions make plain that

persons who may have once illegally entered or remained illegally within the United States, but are now legal residents. As discussed earlier in ¶ 14, were Proposition 100 to apply to such per-

we do not sit as a super-legislature to weigh the wisdom of legislation nor to decide whether the policy which it expresses offends the public welfare. . . . [S]tate legislatures have constitutional authority to experiment with new techniques; they are entitled to their own standard of the public welfare."). Thus, in considering Proposition 100 our Legislature referenced federal problems with illegal immigration. In particular, the Senate Fact Sheet cited a provision of the Federal Bail Reform Act of 1984 that mandated temporary pretrial detention for a person who is "not a citizen of the United States or lawfully admitted for permanent residence" if the court determined that such persons may "flee or pose a danger to any other person or the community." 18 U.S.C. § 3142(d)(1)(B), (2); Senate Fact Sheet For H.C.R.2028. These concerns shaped the determination that illegal aliens charged with serious crimes pose a heightened risk of fleeing from prosecution. *See Simpson,* 207 Ariz. at 266 ¶ 12, 85 P.3d at 482 ("A court must 'effectuate the intent of those who framed the provision and, in the case of [a referendum], the intent of the electorate that adopted it.' ") (citation omitted). We, therefore, hold that the Proposition 100 denial of bail serves a legitimate government interest.

*Limited Nature of Detention Under Proposition 100*

¶ 39 Finally, we observe that Proposition 100, like the federal statute in *Demore,* does not authorize a lengthy or undefined period of detention. *Cf. Nadarajah v. Gonzales,* 443 F.3d 1069, 1081 (9th Cir.2006) (declining to apply *Demore* in light of detention lasting over five years); *accord Tijani v. Willis,* 430 F.3d 1241, 1242 (9th Cir.2005) (two years and eight months); *Ly v. Hansen,* 351 F.3d 263, 265, 270–71 (6th Cir.2003) (over one year); *Moallin v. Cangemi,* 427 F.Supp.2d 908, 926–27 (D.Minn.2006) ("Petitioner's detention has not concluded within the limited range set forth [in *Demore* ] and its end is by no means definite.").

sons, it would act as punishment for past acts, rather than serve its intended regulatory purpose.

¶ 40 Arizona Rule of Criminal Procedure ("Rule") 8.1 establishes that criminal trials are given priority over civil trials with respect to docketing. Ariz. R.Crim. P. 8.1(a). Rule 8.2(a)(1) further provides that defendants in custody are entitled to be tried within 150 days of arraignment. Ariz. R.Crim. P. 8.2(a)(1);[9] see Snyder v. Donato, 211 Ariz. 117, 119, ¶ 8, 118 P.3d 632, 634 (App.2005) ("The right to a speedy trial is both constitutional and statutory."); State v. Vasko, 193 Ariz. 142, 146, ¶ 19, 971 P.2d 189, 193 (App.1998) (state speedy trial rule is "more restrictive than the constitutional right to speedy trial"). Thus, any detention imposed under Proposition 100 should be for a relatively brief and defined period of time. E.g., Demore, 538 U.S. at 531 n. 13, 123 S.Ct. 1708 (Government tasked with completing removal proceeding "as promptly as possible"); see Zadvydas, 533 U.S. at 701, 121 S.Ct. 2491.

¶ 41 Moreover, the types of offenses Proposition 100 encompasses are no less serious than those encompassed by the Demore statute. Proposition 100 denies bail to illegal aliens charged with Class 1, 2, 3 and 4 felonies, the least of which is punishable by a minimum of one year in prison. Similarly, the federal statute upheld in Demore denies bail to a lawfully residing alien who is "deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of at least one year." 8 U.S.C. § 1226(c)(1)(C); 538 U.S. at 513 n. 1, 123 S.Ct. 1708. But the federal statute also extends its reach to those aliens who have committed two "crimes involving moral turpitude." 538 U.S. at 513 n. 1, 123 S.Ct. 1708; §§ 1226(c)(1)(B), 1227(a)(2)(A)(ii). Therefore, at the least, Proposition 100 does not impact criminal offenses that are less severe

than those that were implicated by the federal statute in Demore.

¶ 42 In adopting Proposition 100, the electorate and the Legislature weighed the gravity of the potential flight risks posed by illegal aliens charged with class 1–4 felonies and found that the risks were sufficient to warrant a denial of bail. See Simpson, 207 Ariz. at 269, ¶ 25, 85 P.3d at 486; Nollan v. Cal. Coastal Comm'n, 483 U.S. 825, 846, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) ("To make scientific precision a criterion of constitutional power would be to subject the State to an intolerable supervision hostile to the basic principles of our Government.") (citation omitted). Proposition 100 thus serves a legitimate and compelling governmental interest and imposes only a relatively brief and defined period of detention when it applies, all in accord with substantive due process considerations.[10]

**CONCLUSION**

¶ 43 We conclude that Proposition 100 applies only to illegal aliens who currently remain illegally within the United States. We further conclude that Proposition 100 comports with the constitutional standards of equal protection and substantive due process. For these reasons, and because Petitioner's special action is moot as to him, we accept jurisdiction but deny relief.

CONCURRING: ANN A. SCOTT TIMMER, Judge.

KESSLER, Judge, specially concurring:

¶ 44 I concur with the result and, except for the application of the Salerno test, I essentially agree with the reasoning of the majority. I write separately to explain two differences I have with the majority and to emphasize what the court does not decide in this opinion.

Proposition 100 serves the legitimate compelling governmental interest of ensuring that defendants appear to face trial. See Bell, 441 U.S. at 534, 99 S.Ct. 1861. It is "carefully limited" because it encompasses persons recognized as posing flight risks, see Demore, 538 U.S. at 528, 123 S.Ct. 1708, and only applies when such persons face criminal charges that could result in significant minimum prison sentences.

9. Rule 8.2(a)(1) provides further time in certain complex cases. Ariz. R.Crim. P. 8.2(a)(3).

10. Moreover, we conclude that Proposition 100 can withstand even a heightened form of substantive due process review, such as the one undertaken in Salerno. 481 U.S. at 750–51, 107 S.Ct. 2095 (bail exception must be carefully limited to serve a legitimate and compelling governmental interest). As we have explained,

¶ 45 The only issues before us are the facial invalidity of Proposition 100 under substantive due process principles and whether Proposition 100 can constitutionally apply to persons who may have illegally entered, but are legally present in the United States. I would apply the "large fraction" test to determine invalidity. *Supra,* ¶ 9 and n. 4. I reach that conclusion because the United States Supreme Court has not applied the Salerno "no circumstances" test in a challenge to denials of bail based on an individual's membership in a group rather than based on individualized determinations of flight risk. Given the uniqueness of this setting and the consequences it can have based on an unconvicted individual's liberty interest, I think it behooves us to apply this less stringent test.

¶ 46 That said, I agree with the majority that which test we apply is not determinative because petitioner has not presented to this Court or to the superior court any evidence that Proposition 100 would be facially unconstitutional in the large fraction of cases.[11] This failure of proof does not preclude another party from raising such an issue and attempting to create an appropriate record, such as by showing that in the large fraction of cases pretrial delays increase the period of incarceration beyond a constitutionally permitted timeframe.

¶ 47 Nor does our decision preclude as-applied challenges to Proposition 100. Thus, for example, neither party has raised the issue whether application of Proposition 100 to a person who is in the country illegally, but based on specific facts poses no flight risk, would be unconstitutional because it would not be sufficiently constitutionally related to the legitimate governmental purpose of ensuring presence at trial. *Supra,* ¶ 14 (denying bail under Proposition 100 to persons lawfully in the United States would act as a punishment for past acts rather than to serve the regulatory purpose of ensuring presence at trial); *Salerno,* 481 U.S. at 747, 107 S.Ct. 2095 (court must determine whether the limitation on bail "appears excessive in relation to the alternative purpose assigned [to it].") (*quoting Schall v. Martin,* 467 U.S. 253, 269, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984)). Such an as-applied challenge must await further cases.

¶ 48 Similarly, there may be lengthy pretrial delays in specific cases based on exclusions of time from the periods required by Arizona Rule of Criminal Procedure 8.1 or waivers from such time requirements granted by our Supreme Court. *See* Rules 8.1(d) and 8.4. A specific challenge to the constitutionality of pretrial incarceration under Proposition 100 based on a lengthy incarceration would be an as-applied challenge and necessarily not be precluded by our decision. *Cf. Demore,* 538 U.S. at 532–33, 123 S.Ct. 1708 (Kennedy, J., concurring) ("Were there to be an unreasonable delay by the INS in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons.").

---

11. The majority points out that the legislative history to Proposition 100 shows that its sponsors intended it to be regulatory in nature, rather than punitive. *Supra,* ¶¶ 32–35. This legislative intent is important because, if the express intent was to punish persons illegally in the country, Proposition 100 would probably be facially invalid. Salerno, 481 U.S. at 747, 107 S.Ct. 2095. I agree that the overall stated intent was to regulate rather than to punish, given the legislative history and the statements of some of the sponsors. *Supra,* ¶¶ 32–35. This conclusion, however, is not free from doubt since several of the statements by sponsors in the publicity pamphlet reveal a mixed motive, including that Proposition 100 was intended in part to "secure our borders." However, these same supporters and others included express statements that support the view Proposition 100 was regulatory in nature— to either ensure persons covered by it attended trial or to protect our communities from violence.