OPINION
TALLMAN, Circuit Judge:
In 2006, Arizona voters overwhelmingly approved an amendment to their state constitution known as “Proposition 100.” It commands that Arizona state courts may not set bail “[f]or serious felony offenses as prescribed by the legislature if the person charged has entered or remained in the United States illegally and if the proof is evident or the presumption great as to the present charge.” Ariz. Const, art. II, § 22(A)(4) (as amended). Felony arrestee plaintiffs Angel Lopez-Valenzuela and Isaac Castro-Armenta filed a class action in the United States District Court for Arizona seeking declaratory, injunctive, and habeas relief challenging the constitutionality of Proposition 100 and its implementing statute and rules. They argue that the new criminal procedures violate the substantive and procedural due process guarantees of the Fourteenth Amendment, the Excessive Bail Clause of the Eighth Amendment, and the Sixth Amendment right to counsel. They further claim that the Arizona law is preempted by federal immigration law. The district court granted summary judgment and partial dismissal in favor of the Arizona state officials named in the suit. We affirm.
I
Voters approved the November 2, 2006, ballot measure by a margin of 78 percent to 22 percent. Prior to passage of Proposition 100, Article II, Section 22 set forth several exceptions to the general presumption that persons charged with crimes are entitled to bail. These exceptions were for particularly serious offenses such as murder or sexual abuse of children or other indicia of dangerousness. To ensure the defendant’s presence throughout his criminal prosecution, amended Article II, Section 22 now provides that no bail may be set “[f]or serious felony offenses as prescribed by the legislature if the person charged has entered or remained in the United States illegally and if the proof is evident or the presumption great as to the present charge.” Ariz. Const, art. II, § 22(A)(4). Proposition 100 does not contain a definition of “serious felony offense.” To make that determination we must look to the general laws of- Arizona. ■ Prior to Proposition 100’s passage, the Arizona Legislature passed House Bill 2580, defining “serious felony offense,” should Proposition 100 be adopted by the electorate, as any Class 1, 2, 3, or 4 felony or aggravated driving-under-the-influence offense. Ariz. Rev.Stat. Ann. § 13-3961(A)(5)(b).
In the early days after Proposition 100’s enactment there was confusion over the *1058 standard of proof that should apply to the determination of immigration status for bail purposes during an initial appearance (“IA”).[1] Some IA commissioners were applying a “proof evident/presumption great” standard to both the criminal charge and the immigration status determination. To resolve the uncertainty, on April 3, 2007, the Chief Justice of the Arizona Supreme Court issued Administrative Order 2007-30. Admin. Order No. 2007-30, available at http://www.azcourts.gov/portals/22/ admorder/orders07/2007-30.pdf (last visited June 10, 2013). The Order set the standard of proof for IA immigration status determinations as probable cause. Id. But the Order also directed that if a commissioner found probable cause to believe that a defendant had entered or remained in the United States illegally, a follow-up evidentiary hearing on whether bail should be denied was to be held within twenty-four hours. Id. At that hearing, known as a Simpson/Segura hearing,[2] defendants would be “entitled to representation by counsel, and to present evidence, testimony, and witnesses, by proffer or otherwise, to provide evidence on the defendant’s behalf.” Id. The standard of proof for immigration status at the Simpson/Segura hearing was to be the “proof evident/presumption great” standard. Id.
Before Administrative Order 2007-30 could be implemented, however, the Arizona Legislature passed Senate Bill 1265, codifying the probable cause standard for the immigration status determination. Ariz. R.Crim. P. 7.2(b). In the wake of the Bill’s passage, the Chief Justice rescinded Administrative Order 2007-30 and adopted amendments to the Arizona Rules of Criminal Procedure recognizing the probable cause standard for immigration status determinations. See Segura, 196 P.3d at 840 (detailing the history of Proposition 100, Administrative Order 2007-30, and Senate Bill 1265). The current Rules now provide that the bail determination must be made at the initial appearance, that “any party” may move for a reexamination of release conditions imposed at the initial appearance, and that a hearing on such motion “shall be held on the record as soon as practicable but not later than seven days after filing of the motion.” Ariz. R.Crim. P. 7.4(b).
Plaintiff-Appellant Angel Lopezr-Valen-zuela was arrested and charged with the crime of dangerous drug transportation and/or offer to sell, a Class 2 felony under Arizona criminal law. Ariz.Rev.Stat. Ann. § 13-3407(A)(7). Because the IA commissioner found probable cause to believe him to be in the United States illegally, he was denied bail pursuant to the Proposition 100 laws. Plaintiff-Appellant Isaac Castro-Armenta was arrested and charged with Class 2, 3, and 4 felonies including aggravated assault with a deadly weapon, kid-naping, and assisting a criminal syndicate. Probable cause was also found to believe that Castro-Armenta was in the United States illegally and he too was denied bail under Proposition 100.
*1059 The two arrestees then filed a combined class action complaint and habeas corpus petition seeking declaratory and injunctive relief to strike down the Proposition 100 laws and to restrain the state’s bail enforcement policies and practices. The district court granted Plaintiffs’ motion to certify their lawsuit as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2), and by the same order granted Defendants’ Rule 12(b)(6) motion to dismiss their claim that Proposition 100 was preempted by federal immigration laws. Lopez-Valenzuela v. Maricopa County, No. 08-00660 (D.Ariz. Dec. 9, 2008) (order certifying class and granting partial dismissal).[3] The parties filed cross-motions for summary judgment on the remaining claims and the district court entered final judgment granting Defendants’ motion as to five of the remaining six counts in their Complaint. The court subsequently dismissed without prejudice (per Plaintiffs’ request) the final count addressing the Fifth Amendment right against self-incrimination.[4] Lopez-Valenzuela v. Maricopa County, No. 08-00660 (D.Ariz. Mar. 19, 2011) (order granting summary judgment and dismissal).
II
We review de novo a district court’s grant or denial of summary judgment. Russell Country Sportsmen v. U.S. Forest Serv., 668 F.3d 1037, 1041 (9th Cir.2011). We also review de novo a district court’s grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Cousins v. Lockyer, 568 F.3d 1063, 1067 (9th Cir.2009). We review a challenge to the constitutionality of a statute de novo as well. United States v. Gonzales, 307 F.3d 906, 909 (9th Cir.2002).
A-
We must first determine whether Proposition 100 bail laws create an impermissible scheme of punishment in violation of the federal Constitution’s Due Process Clause. We evaluate substantive due process challenges to bail statutes under the framework articulated in United States v. Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). The Supreme Court there instructed us that “[t]o determine whether a restriction on liberty constitutes impermissible punishment or permissible regulation, we first look to legislative intent.” Id. at 747, 107 S.Ct. 2095. Absent an express intent on the part of the legislature to punish, “the punitive/regulatory distinction turns on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it.” Id. (internal citations and quotation marks omitted). In other words, under this two-pronged approach, even where a legislature does not express a clear punitive intent a bail regulation may still be unconstitutional if it is excessive in relation to its legitimate alternative purpose.
The Arizona Legislature made no formal findings on the purpose of Proposition 100. Absent such findings, courts can look to the legislative record as well as to statements made in election materials circulated to the voters who approved it to determine legislative intent. See City of Cuyahoga Falls v. Buckeye Cmty. Hope Found., 538 U.S. 188, 196-97, 123 S.Ct. 1389, 155 L.Ed.2d 349 (2003). Having reviewed all of the evidence, we are convinced, as was the district court, that the record, as a whole does not show that *1060 Proposition 100 was motivated by an improper punitive purpose.
It is undisputed that during committee hearings on the Proposition 100 laws, several legislators made statements about controlling illegal immigration. For example, then-Representative Russell Pearce, the sponsor of the Proposition 100 bill, speaking in a March 2005 Arizona Senate Judiciary Committee hearing, stated: “[B]ad enough you’re illegal but you commit a serious crime you ought not to be bondable unless you’re released after prosecution, after you do your time to ICE and then to be deported. In fact, all illegal aliens in this country ought to be detained, debriefed and deported.” Senate Judiciary Committee Meeting on H.B. 2389, Mar. 28, 2005, 47th Leg., 1st Regular Sess. (Ariz. 2005). Senator Jack Harper, speaking at the same hearing, declared: “[W]hat part of illegal don’t we understand? Illegal aliens shouldn’t be able to get bond for anything let alone a Class 1, 2, or 3 felony.” Id. However, in this March 28 committee meeting alone, Pearce mentioned flight risk and public safety as the primary reasons behind the Proposition 100 laws three different times. For example:
The aim of the bill is to keep those folks who are a threat to our society, again there’s several criteria for release on bail as you know currently.... This simply adds to that criteria because one of the risks, one of the factors involv[ed] in setting bond currently is flight risk. If you are not in this country legally and have no roots ... their flight risk is a much greater risk.

Id.

Representative Pearce again discussed flight risk during a House Floor Meeting. House Floor Meeting on H.B. 2580, Mar. 7, 2006, 47th Leg., 2nd Regular Sess. (Ariz. 2006). He mentioned flight risk and public safety five times during the June 7, 2007, House Floor Meeting on the companion Senate Bill. House Floor Meeting on S.B. 1265, June 7, 2007, 48th Leg., 1st Regular Sess. (Ariz. 2007). Other Representatives mentioned flight risk and public safety as motiving factors three more times in the same legislative meeting. Thus, while it is clear from the record that Arizona lawmakers were concerned with the effects of illegal immigration when they were debating the Proposition 100 laws, a fair reading of the record does not support Plaintiffs-Appellants’ argument that Proposition 100’s primary purpose is to punish and deter immigration offenses.[5]
Nor do the materials provided to voters demonstrate a clear punitive purpose. The official voter information guide contained four statements in favor and one against Proposition 100. Publicity Pamphlet Issued by Janice K. Brewer, then Arizona Secretary of State, Ballot Propo *1061 sitions & Judicial Performance Review, General Election, November 7, 2006, 13-14, available at http://www.azsos.gov/ election/2006/info/PubPamphlet/english/ Propl00.htm. A statement by Don Goldwater, a candidate for Arizona Governor reads in part: “This Ballot Measure addresses one area that needs to be resolved in this fight to secure our borders and reduce the level of crime in our neighborhoods.” Id. at 14. But a statement by Representative Pearce reads: “With few real ties to the community and often completely undocumented by state agencies, any illegal aliens can easily escape prosecution for law breaking simply because they are so difficult to locate.” Id. at 13. The Maricopa County Attorney wrote: “Far too many illegal immigrants accused of serious crimes have jumped bail and slipped across the border in order to avoid justice in an Arizona courtroom.” Id. at 13-14. The other supporting statements also invoked “flight risk.” See id. On balance, we agree with the district court that the ballot materials to which voters were exposed are, at best, arguably neutral on the question of punitive intent.
Likewise, the media coverage of Proposition 100 leading up to the November 2006 election cited in the record does not establish a punitive purpose. Although one Arizona newspaper piece described Proposition 100 as one of “a foursome of ballot measures aimed at curbing illegal immigration,” Brady McCombs, Four Propositions on Entrants Out in Front, Ariz. Daily StaR, Oct. 29, 2006, at B2, another editorial stated that “An illegal immigrant is, without a doubt, .a high [flight] risk because of the ability to come and go out of the country when they please.” Moses Sanchez, Research Immigration Issues Before Voting, Araz. Republic, Oct. 11, 2006, at 19. And in the same video where a CNN correspondent discussed “four ballot measures that will further crack down on illegal aliens in the state,” the Maricopa County Attorney said: “Well, Arizona has a tremendous problem with illegal immigrants coming into the state, committing serious crimes, and then absconding, and not facing trial for their crimes, either because they jump bail after they are let out, or because, when they are let out on bail, the federal government deports them.” Lou Dobbs Tonight (CNN television broadcast Oct. 13, 2006). Reviewing the record, neither the legislative history nor the voter materials and media coverage would support the argument that Proposition 100 was motivated by a punitive rather than a regulatory purpose. Proposition 100 survives the first prong of the Salerno substantive due process test.
B
The second prong of the Salerno substantive due process test asks that we examine whether Proposition 100 is excessive in relation to its legitimate alternative purpose. 481 U.S. at 747, 107 S.Ct. 2095. Proposition 100’s legitimate — indeed its compelling — purpose is ensuring that defendants remain in the United States to stand trial for alleged felony violations of Arizona’s criminal laws. Thus, the correct inquiry under Salerno is whether Proposition 100 is “reasonably related to [the] legitimate governmental objective” of controlling the flight risk of defendants accused of certain state-law felonies. Bell v. Wolfish, 441 U.S. 520, 539, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). We hold that it is.
Plaintiffs-Appellants argue that Proposition 100 is excessive in relation to its goal because it precludes any individualized determinations of flight risk and covers a broad range of offenses, including some that might result in non-custodial sentences. In essence, they argue, a Proposition 100 status determination serves as a proxy for an individualized finding of flight risk because while a defendant held non-bondable under Proposition 100 can seek an individualized Simpson/Segura hearing, *1062 the judicial officer will determine only that there is proof evident or presumption great that the defendant committed a Class 1 through 4 felony and probable cause to believe that the defendant entered or remained in the country illegally. See Segura, 196 P.3d at 843 (explaining that “Simpson identified what is necessary to fully litigate a no-bail determination”); Simpson v. Owens, 207 Ariz. 261, 85 P.3d 478, 494 (Ariz.Ct.App.2004) (“Arizona law does not require that a risk of flight or a risk of recidivism be considered before bail is denied.”).[6]
Denial of bail without individualized consideration of flight risk or dangerousness is not unusual. After all, the vast majority of states categorically deny the right to bail to persons charged with capital crimes, and at least eight states categorically deny bail to those charged with crimes punishable by life imprisonment.[7] Missouri has a bail provision similar to Arizona’s Proposition 100 laws whereby judges are to presume that no set of bail conditions can reasonably assure a defendant’s appearance if the judge reasonably believes that the defendant “is an alien unlawfully present in the United States.” Mo.Rev.Stat. § 544.470(2). Defendants held without bail under Missouri’s statute are given the opportunity to prove their lawful presence in the United States but if unable to do so are held without bail, irrespective of any individualized considerations of flight risk. Id. Arizona’s Proposition 100 laws, therefore, are neither unprecedented nor unique.
*1063 Many states deny bail for those accused of a wide range of offenses (including certain drug offenses, sexual assault offenses, crimes of violence, and repeat felonies) after an individualized showing of flight risk or dangerousness,[8] yet not all states require such individualized determinations. Notably, Arizona is one of the states that categorically denies bail to persons charged with certain particularly serious crimes without requiring individualized determinations of flight risk or dangerousness. See Ariz. Const, art. II, § 22 (“All persons charged with crime ghall be bailable by sufficient sureties, except: 1. For capital offenses, sexual assault, sexual conduct with a minor under fifteen years of age or molestation of a child under fifteen years of age when the proof is evident or the presumption great.”); Simpson, 85 P.3d at 494 (“Arizona law does not'require that a risk of flight or a risk of recidivism be considered before bail is denied.”).[9] Thus, Proposition 100 is nothing more than an extension of Arizona’s existing pretrial detention scheme to include defendants the state believes present a significant flight risk, thus “narrowly focus[ing] on a particularly acute problem in which the Government interests are overwhelming.” Salerno, 481 U.S. at 750, 107 S.Ct. 2095.[10]
*1064 The Court of Appeals of Arizona embraced this justification when it upheld Proposition 100 against a constitutional challenge in Hernandez v. Lynch, 216 Ariz. 469, 167 P.3d 1264 (Ariz.Ct.App. 2007). Quoting Salerno, the Arizona court explained that “our electorate and Legislature ‘perceived pretrial detention as a potential solution to a pressing societal problem.’” Id. at 1274. Addressing the argument that Proposition 100 encompasses a broad range of crimes, including those often resulting in non-custodial sentences, the court pointed out that “the types of offenses ... are no less serious than those encompassed by the [federal detention statute upheld in Demore ].” Id. at 1275.[11] “Proposition 100 denies bail to illegal aliens charged with Class 1, 2, 3 and 4 felonies, the least of which is punishable by a minimum of one year in prison.” Id.
Arizona’s substantial interest in ensuring that those charged with serious state-law crimes are available to answer for them is undeniable. To strike down Proposition 100 on the grounds that it violates substantive due process would require us to find that Proposition 100 “is not reasonably related to a legitimate goal” and is “arbitrary and purposeless” such that we “may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted.” Bell, 441 U.S. at 539, 99 S.Ct. 1861. Although Salerno requires an individualized determination of dangerousness for nonbondability decisions under the federal Bail Reform Act of 1984, our analysis of Arizona’s Proposition 100 need not parallel Salerno’s analysis of the federal Act. This is so because Proposition 100 seeks to target flight risk rather than dangerousness.
In pursuit of this undeniably legitimate goal, Proposition 100 reaches a larger number of crimes than the Bail Reform Act and allows for denial of bail on a showing of unlawful presence. However, simply because the decision to deny bail pursuant to Proposition 100 is arrived at differently than it would be under federal law does not mean that Proposition 100 necessarily violates substantive due process. Balancing the individual’s right to liberty with Arizona’s compelling interest in assuring appearance at trial, “we cannot categorically state that pretrial detention ‘offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.’ ” Salerno, 481 U.S. at 751, 107 S.Ct. 2095 (citing Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934)). Because Proposition 100 is reasonably related to the legitimate goal of controlling flight risk, we hold that it is not excessive in violation of substantive due process under the Constitution of the United States.
Ill
“When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. ... This requirement has traditionally been referred to as ‘procedural’ due process.” Salerno, 481 U.S. at 746, 107 S.Ct. 2095 (citing Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 *1065 (1976)). The felony arrestees assert that the Proposition 100 laws violate procedural due process by failing to provide a meaningful opportunity for accused persons to contest their status determinations. Specifically, Plaintiffs-Appellants argue that the probable cause standard applied to immigration status determinations at both the initial appearance and any subsequent Simpson/Segura hearing is constitutionally inadequate. They also challenge Defendants-Appellees’ implementing policies and practices as procedurally deficient and error-prone. We believe Proposition 100 survives both of these challenges.
A
“[A] judicial determination of probable cause is a prerequisite to any extended restraint on the liberty of an adult accused of crime.” Schall v. Martin, 467 U.S. 253, 274-75, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984) (citing Gerstein v. Pugh, 420 U.S. 103, 114, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975)). Plaintiffs-Appellants ask us to hold that immigration status inquiries in Proposition 100 cases are fundamentally incompatible with a probable cause standard of proof because immigration status is a technical legal question requiring application of the federal Immigration and Nationality Act rather than a probabilistic inquiry. They request the use of a heightened standard “that takes into account the complexity of the question and the exceptionally strong liberty interest at stake.” Corrected Brief of Appellants at 46, No. 11-16487 (Nov. 2, 2011). The argument asks too much at the initial appearance and ignores the procedural protections should a request be made for a review hearing seven days later.
Where the United States seeks to hold a dangerous defendant without bail, the federal Bail Reform Act places the burden of proof on the government to show by clear and convincing evidence that the defendant poses a danger such that “no condition or combination of conditions will reasonably assure the safety of any other person and the community....” 18 U.S.C. § 3142(f)(2). The Act is silent about the standard of proof required when the government seeks pretrial detention due to flight risk, but we have held that under the Act flight risk must only be shown by the lower “clear preponderance of the evidence” standard. See United States v. Motamedi 767 F.2d 1403, 1406 (9th Cir.1985). In practice, temporary detention is frequently ordered by federal magistrate judges at the initial appearance subject to review at a subsequent detention hearing where the parties are better prepared to litigate the issue.
The district court here found that the difference between Arizona’s probable cause standard for Proposition 100 status determinations and the federal “clear preponderance” standard for flight risk determinations does not amount to a procedural due process violation, and we agree. States are entitled to determine the laws that govern their criminal justice systems, and the Arizona Legislature spoke clearly when it passed Senate Bill 1265 codifying the probable cause standard. This is especially true in light of the prior confusion that had surrounded the standard of proof for Proposition 100 status determinations. Taking account of this confusion, as well as the complexity of status determinations and the strong liberty interests at stake, the Arizona Legislature nevertheless felt that the probable cause standard was constitutionally adequate. The fact that Congress chose to set a higher standard of proof for dangerousness determinations under federal bail law does not render any less legitimate Arizona’s choice regarding the standard of proof that best achieves its goal of preventing flight before trial. Arizona’s probable cause standard for Proposition 100 status determinations does not violate the United States Constitution.
*1066 B
In Simpson v. Owens, the Court of Appeals of Arizona established that due process requires an accused “be provided a [bail] hearing, ... during which he [or she] must be given an opportunity to be heard at a meaningful time and in a meaningful manner,” 85 P.3d at 487 (internal citations and quotation marks omitted). Drawing from the procedures outlined in Salerno, the Simpson court explained that in an Arizona bail hearing the accused is entitled to counsel, has the right to examine and cross-examine witnesses, to review in advance-witnesses’ prior written statements, and that the court must make a determination on the record. Id. at 492-93.
Plaintiffs-Appellants nevertheless claim that procedures employed both at initial appearances and bail hearings in Arizona violate procedural due process guarantees and lead to incorrect status determinations. Specifically, they note that in Mari-copa County sheriffs deputies question ar-restees, check various databases including federal immigration databases, and then list on Post-It notes the docket numbers of those they deem nonbondable, delivering those notes to the prosecution and the court who generally give the notes conclusive effect at initial appearances. Proposition 100 defendants are not permitted to see the evidence the deputies submit in support of a finding of nonbondability under Proposition 100, either at the initial appearance or at the Simpson!Segura hearing (if one is requested), and arrestees are not informed during the initial appearance of their right to an evidentiary hearing on bondability.
The concern with the procedures employed by sheriffs deputies at initial appearances is best addressed by looking to the remedial procedures already in place in Arizona via Simpson/Segura hearings. The Court of Appeals of Arizona struck a balance between the state’s interest in detaining certain arrestees and the arrestees’ fundamental liberty interests when it declared that “[i]nitial appearances serve the limited function of providing some check on the ability of the state to hold a defendant, but they continue to be ill-suited to support conclusive findings affecting a defendant’s liberty.” Segura, 196 P.3d at 841. Simpson/Segura hearings are available in Arizona precisely because
[i]t would be a rare occasion when an adequate bail hearing could be conducted at the initial appearance for a [Proposition 100] offense.... [I]t is not feasible for the bail hearing to take place at the time of the initial hearing if for no other reason than that the accused must be given adequate notice to prepare for the hearing.
Simpson, 85 P.3d at 495. Thus, any deficiencies in the probable cause determination made at an initial appearance — due to deputies’ Post-It notes or otherwise' — can be cured at a Simpson/Segura hearing. Indeed, that is exactly what such hearings are for.
Plaintiffs-Appellants contend that Proposition 100 defendants are not permitted to see the evidence submitted in support of a finding of nonbondability under Proposition 100. A review of the record reveals that Maricopa County’s Section 287(g)-cer-tified deputies[12] must refuse to provide *1067 documents to defendants or their attorneys regarding immigration status because those documents are federal immigration documents and under federal law are not discoverable until immigration proceedings are commenced against the alien by the U.S. Department of Homeland Security. There is no indication from the record that the sheriff deliberately withholds information from Proposition 100 defendants or otherwise deprives them of a fair opportunity to litigate their status determinations at Simpson!Segura hearings; therefore, we hold that procedural due process guarantees are not violated.
Plaintiffs-Appellants also claim that ar-restees are not informed during the initial appearance of their right to an evidentiary hearing on bondability. That may well be true. It does not appear that the IA commissioners regularly inform the arrestees of their right to such hearings. Although translations are provided at the hearings, some arrestees do not speak English. Many are unrepresented at their initial appearances, and if indigent they may not meet with appointed counsel for some time after their Proposition 100 status determinations. During this period they will be detained pursuant to Proposition 100 while they wait to meet with their appointed attorneys, and may not know that they can request a Simpson!Segura hearing to challenge their status determinations until they speak with their lawyers.
Nevertheless, whether or not they are immediately aware of it, Arizona Rule of Criminal Procedure 7.4(b) provides detainees a right to request a prompt bond hearing, and the hearing must take place within seven days of the request. Arizona’s Rules of Criminal Procedure give criminal trials priority over civil trials, so even a detainee who fails to request a Simpson!Segura hearing is entitled to be tried within 150 days of arraignment. Hernandez, 167 P.3d at 1275. The Supreme Court in Demore approved detention of illegal aliens for periods longer than that. 538 U.S. at 529-31, 123 S.Ct. 1708. In light of Arizona’s legitimate and compelling interest in controlling flight risk, the pretrial detention of arrestees who, it bears repeating, the government must demonstrate by a proof evident/presumption great standard committed Class 1 through 4 state-law felonies, does not violate procedural due process simply because arrestees are not informed at their initial appearances of the existence of Rule 7.4(b).[13] While Arizona’s initial appearance procedures may not be ideal, they are not fundamentally unfair so as to violate the Constitution.
IV
We turn next to Plaintiffs-Appellants’ argument that Proposition 100’s categorical bail prohibition is arbitrary and unreasonable in violation of the Eighth Amendment. The Excessive Bail Clause of the Eighth Amendment provides that, “[ejxcessive bail shall not be required,” U.S. Const. amend. VIII, cl. 1, but as the Supreme Court observed in Salerno, “[t]his Clause, of course, says nothing about whether bail shall be available at all.” 481 U.S. at 752, 107 S.Ct. 2095. “The Eighth Amendment has not prevented Congress from defining the classes of cases in which bail shall be allowed in this country.” Carlson v. Landon, 342 U.S. *1068 524, 545, 72 S.Ct. 525, 96 L.Ed. 547 (1952). To determine whether a particular legislative denial of bail violates the Excessive Bail Clause, we “look to the valid state interests bail is intended to serve for a particular individual and judge whether bah conditions are excessive for the purpose of achieving those interests.” Galen v. Cnty. of L.A., 477 F.3d 652, 660 (9th Cir.2007). Because we have determined that Proposition 100 is not excessive in relation to Arizona’s interest in ensuring that illegal alien criminal defendants appear for trial, it follows that Proposition 100 does not violate the Excessive Bail Clause.
Plaintiffs-Appellants point to pre-Salemo authority as support for their position that Proposition 100 categorically denies bail arbitrarily and unreasonably. Hunt v. Roth, 648 F.2d 1148, 1162 (8th Cir.1981), vacated as moot sub nom. Murphy v. Hunt, 455 U.S. 478, 481, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982), held that the Nebraska constitution’s categorical denial of bail to those charged with certain sex offenses violated the Eighth Amendment because it did not allow for individualized determinations of suitability for pretrial release. But Hunt, just as Salerno, dealt with a case in which the government’s interest was “protecting society from [persons accused of offenses],” id. at 1163, and “[t]he state [did] not contend that an absolute denial of bail to all persons charged with forcible rape is rationally related or necessary to assuring their appearance at trial.” Id. at 1162. Thus, unlike Proposition 100, the Nebraska law was focused on dangerousness rather than flight risk. Plaintiffs-Appellants point to no cases holding that a legislature’s decision to categorically deny bail in the interest of assuring presence at trial is arbitrary or unreasonable in violation of the Eighth Amendment. Because Proposition 100 bail conditions are not excessive in light of Arizona’s legitimate interests and bail is not denied arbitrarily or unreasonably, the Proposition 100 laws do not violate the Eighth Amendment Excessive Bail Clause.
y
Plaintiffs-Appellants contend that Proposition 100 has complicated initial appearances in Arizona to such a degree that they have become an adversarial and critical stage of proceedings triggering the Sixth Amendment right to counsel. The Maricopa County Attorney’s Office staffs IA proceedings, although prosecutors are only called in to the IA courtroom if needed. Maricopa County sheriffs deputies occasionally testify at IAs to address questions from the court regarding an arres-tee’s Proposition 100 status. After the passage of Proposition 100, the indigent defense agency in Maricopa County began sending attorneys to IAs, but the practice was halted after Maricopa County decided not to fund county-paid counsel for that purpose.
Initial appearances in Arizona must take place within 24 hours of an arrest. Ariz. R.Crim. P. 4.1(a). The proceedings are brief and no plea is entered. During the proceedings the IA commissioner must: ascertain the defendant’s name and address; inform the defendant of the charges, the right to counsel, and the right to remain silent; determine whether probable cause exists to believe that a crime was committed (if the arrest was made without a warrant); appoint counsel if the defendant is eligible; and determine release conditions, including a Proposition 100 status determination if appropriate. Ariz. R.Crim. P. 4.2(a).
Both we and the Supreme Court of Arizona have held that there is no constitutional right to an attorney at initial appearances. See United States v. Perez, 776 F.2d 797, 800 (9th Cir.1985), overruled on *1069 other grounds by United States v. Cabaccang, 332 F.3d 622, 634-35 (9th Cir.2003) (en banc); State v. Cook, 150 Ariz. 470, 724 P.2d 556, 561 (1986). Plaintiffs-Appellants argue that in light of the immigration status determinations that now may take place at IAs, these pre-Proposition 100 precedents no longer apply.
We employ a three-factor test to determine whether an event constitutes a critical stage of a prosecution. If (1) “failure to pursue strategies or remedies results in a loss of significant rights,” (2) “skilled counsel would be useful in helping the accused understand the legal confrontation,” or (3) “the proceeding tests the merits of the accused’s case,” then the proceeding is a critical stage triggering the right to counsel. United States v. Bohn, 890 F.2d 1079, 1080-81 (9th Cir.1989) (citing Menefield v. Borg, 881 F.2d 696, 698—99 (9th Cir.1989)). Applying this test, IAs in Arizona — even those that include Proposition 100 status determinations — do not trigger the right to counsel.
Given the administrative nature of Arizona’s IA proceedings, it is unlikely that a defendant unrepresented by counsel would fail to pursue a strategy or remedy during the initial appearance and thereby lose significant rights. The only strategies or remedies available to a defendant who seeks to avoid pretrial detention are to deny either the crime(s) alleged or that the defendant has entered or remained in the United States illegally. But, as no plea is entered at an IA and the “initial appearance provides no opportunity for a defendant to present evidence or make any argument regarding the law or evidence,” Segura, 196 P.3d at 841, these are not remedies available at the initial appearance. Rather, these are remedies available after the initial appearance at a Simpson/Segura hearing, by which point counsel will have been appointed. Thus, Proposition 100 initial appearances do not run afoul of the first factor of the Bohn test.
Likewise, due to the administrative nature of IAs in Arizona, skilled counsel would not be useful in helping the accused understand the legal confrontation. Record transcripts of Maricopa County IAs demonstrate that IA commissioners are doing what Rule 4.2(a) requires. Skilled counsel is unnecessary to help an accused understand the purely administrative matters covered during an IA — in fact the appointment of counsel is one of the tasks performed at the first appearance. “To require that counsel be appointed before the judge asks routine questions such as the defendant’s name and financial ability would be self-defeating.” Perez, 776 F.2d at 800. Proposition 100 procedures therefore survive the second factor of Bohn’s, “critical stage” test.
Finally, Proposition 100 status determinations at IAs do not test the merits of the accused’s case such that Bohn’s third factor is implicated. No plea is entered, and any discussion of immigration status is undertaken for the sole purpose of determining whether a defendant is nonbonda-ble under Proposition 100. The IA transcripts cited to by Plaintiffs-Appellants support this reading. For example, when one defendant’s interpreter said that “[defendant] has spoken to his solicitor and she is getting the case ready for asylum,” the commissioner responded, “You can certainly discuss that matter with your solicitor and until your asylum petition is approved ... there is probable cause to believe that you’re in the country illegally at this time.... [A]t this time, because of your immigration status, you’re not entitled to bond-” Plaintiffs-Appellants have not put forward any evidence demonstrating that a defendant’s statements about immigration status at an IA are being used in subsequent federal criminal prosecutions *1070 for illegal entry or re-entry, or in subsequent state criminal prosecutions where unlawful immigration status is an element of the offense. Accordingly, they have failed to show that Proposition 100 determinations at initial appearances are critical stages that trigger the Sixth Amendment right to counsel.
VI
Proposition 100 laws are neither expressly nor impliedly preempted by federal immigration law. While it is true that many state laws addressing immigration are preempted by federal law, the Supreme Court has said that not “every state enactment which in any way deals with aliens is a regulation of immigration and thus per se preempted” by the federal government’s broad and exclusive constitutional power to regulate immigration. De Canas v. Bica, 424 U.S. 351, 355, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976). Plaintiffs-Appellants argue that Proposition 100 is preempted because it attempts to regulate immigration, intrudes into fields exclusively occupied by federal congressional action, and conflicts with the federal Immigration and Nationality Act. Each of these arguments is unavailing.
A
It is “[a] fundamental principle of the Constitution ... that Congress has the power to preempt state law.” Crosby v. Nat’l Foreign Trade Council, 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). And it is beyond doubt that “[t]he authority to control immigration&emdash;to admit or exclude aliens&emdash;is vested solely in the Federal government.” Takahashi v. Fish & Game Comm’n, 334 U.S. 410, 416, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948) (citing Fong Yue Ting v. United States, 149 U.S. 698, 713, 13 S.Ct. 1016, 37 L.Ed. 905 (1893)); see U.S. Const. art. I, § 8, cl. 4 (Congress has authority to “establish an uniform Rule of Naturalization”). Were the Proposition 100 laws actual regulations of immigration&emdash;that is, were they to actually function as a determination of who should or should not be admitted or allowed to remain in the United States-; they would be preempted. See De Canas, 424 U.S. at 355, 96 S.Ct. 933. But, “standing alone, the fact that aliens are the subject of a state statute does not render it a regulation of immigration.... ” Id. The Proposition 100 laws neither determine who should be admitted to the United States nor prescribe conditions under which legal entrants may remain. Rather, those who are subject to detention under the Proposition 100 laws are being detained because of the crime they are accused of committing. Arizona state officials are not directly facilitating immigration removals and their immigration status decisions for the purposes of Proposition 100 are not binding in subsequent proceedings within the federal immigration system.
Plaintiffs-Appellants argue that Proposition 100 is nevertheless preempted because it creates a state-law category of persons who have “entered or remained in the United States illegally.” Ariz. Const, art. II, § 22(A)(4). Arizona’s implementing statute directs courts making Proposition 100 status determinations to consider, among other things, “[a]ny ... relevant information that is obtained by the court or that is presented to the court by a party or any other person.” Ariz.Rev. Stat. Ann. § 13-3961(A)(5)(a)(vi). Plaintiffs-Appellants claim that Proposition 100 status determinations amount to state-law determinations of immigration status without regard to federal immigration law and federal status determinations. Undeniably, “[t]he States enjoy no power with respect to the classification of aliens.” Plyler v. Doe, 457 U.S. 202, 225, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (citing Hines *1071 v. Davidowitz, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). On this basis, Plaintiffs-Appellants point to several federal district court cases in which state law immigration classifications were deemed preempted. Each of these cases, however, is distinguishable.
In Equal Access Education v. Merten, 305 F.Supp.2d 585, 603 (E.D.Va.2004), the court held that a Virginia higher education admissions policy denying admission to illegal aliens would violate the Supremacy Clause only if the institutions implementing the policy were relying on state rather than federal immigration standards. In League of United Latin American Citizens v. Wilson, 908 F.Supp. 755, 772 (C.D.Cal.1995), the court deemed parts of a California voter-approved initiative preempted, reasoning that portions of the initiative were an impermissible regulation of immigration because “the [immigration status] classification ... is not in any way tied to federal standards.” Likewise, in Hispanic Interest Coalition of Alabama v. Bentley, No. 5:11-cv-02484-SLB, — F.Supp.2d -, -, 2011 WL 5516953, at *23 (N.D.Ala. Sept. 28, 2011), vacated as moot in part by 691 F.3d 1236, 1242 (11th Cir.2012), the court preliminarily enjoined some provisions of Alabama’s House Bill 56 because their implementation would im-permissibly create state classifications of aliens.
Although it is true that Arizona’s implementing statute directs courts making Proposition 100 status determinations to consider “any ... relevant information,” it also commands consideration of “[wjhether a hold has been placed on the arrested person by the United States immigration or customs enforcement.” Ariz.Rev.Stat. Ann. § 13 — 3961(A)(5)(a)(i). Thus, contrary to Plaintiffs-Appellants’ assertions, Arizona state courts are not authorized to make state-law determinations of immigration status without regard to federal status determinations. Unlike in Wilson, the state-law determination here is tied to federal standards. Furthermore, evidence in the record shows that Maricopa County Sheriff’s Office Section 287(g)-certified deputies cross-reference ICE databases when making Proposition 100 recommendations at initial appearances. Finally, the screening questionnaire administered by the deputies to determine whether an ar-restee is subject to Proposition 100 includes questions such as, “Do you have any applications or petitions pending with U.S. CIS?”[14] and, “Have you been removed, deported, excluded or VR’d[15] before from the U.S.?”
This evidence demonstrates that Arizona state officials are not attempting to create a new state-law classification for those who have “entered or remained in the United States illegally,” but rather are seeking to determine whether arrestees are in violation of federal immigration law. As the Supreme Court recently held in Arizona v. United States, — U.S. -, 132 S.Ct. *1072 2492, 2508, 183 L.Ed.2d 351 (2012), Congress has “encouraged the sharing of information about possible immigration violations,” and federal law permits “a policy requiring state officials to contact ICE as a routine matter.” Because Proposition 100 neither regulates immigration nor im-permissibly creates state-law immigration classifications, we hold that Proposition 100 is not constitutionally preempted.
B
Plaintiffs-Appellants next argue that Proposition 100 intrudes on a field exclusively occupied by federal law because it imposes mandatory detention under state law of persons suspected of committing federal immigration law offenses. In support of this claim, Plaintiffs-Appellants cite to myriad federal Immigration and Naturalization Act provisions related to federal immigration detention and removal. De Canas v. Bica, 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976), provides the framework for the resolution of this argument. De Canas teaches, “we will not presume that Congress, in enacting the INA, intended to oust state authority to regulate ... in a manner consistent with pertinent federal laws.” 424 U.S. at 357, 96 S.Ct. 933. Instead, “[o]nly a demonstration that complete ouster of state power including state power to promulgate laws not in conflict with federal laws was the clear and manifest purpose of Congress would justify that conclusion.” Id.. (internal citations and quotation marks omitted).
The INA provisions cited by Plaintiffs-Appellants regulate detention for immigration violations, while Proposition 100 regulates pretrial detention for those arrested for committing Class 1 through 4 state felonies and aggravated driving-under-the-influence offenses. Plaintiffs-Appellants have not shown that Congress intended to effect a “complete ouster of state power” with respect to bail determinations for state-law crimes. Accordingly, we hold that Proposition 100 is not field preempted.
C
Finally, Plaintiffs-Appellants argue that even if Proposition 100 is not field preempted, it nevertheless “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” De Canas, 424 U.S. at 363, 96 S.Ct. 933 (internal citations and quotation marks omitted). Following the Supreme Court’s directive that “[ijmplied preemption analysis does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives” and that “a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act,” Chamber of Commerce of U.S. v. Whiting, - U.S. -, 131 S.Ct. 1968, 1985, 179 L.Ed.2d 1031 (2011), we hold that Proposition 100 does not conflict with federal law.
Plaintiffs-Appellants claim that the Proposition 100 laws impose incarceration for unlawful presence in the United States in opposition to Congress’s judgment as to when aliens should or should not be detained for immigration violations. But Proposition 100 regulates only the bail determinations for state-law crimes and does not impose incarceration for federal immigration law violations. While it is true that in certain instances Proposition 100 may mandate the pretrial detention of a person who would be deemed bondable by a federal immigration judge, such detention is not meant to punish an alleged immigration violation but rather to ensure presence in Arizona to stand trial for alleged state-law crimes.
Plaintiffs-Appellants cite to Arizona v. United States as support for their argument that state officers cannot deprive noncitizens of their liberty based upon pur *1073 ported immigration violations without running afoul of conflict preemption principles. Admittedly, the Arizona court wrote that “it would disrupt the federal framework to put state officers in the position of holding aliens in custody for possible unlawful presence without federal direction and supervision.” 132 S.Ct. at 2509. But Proposition 100 does not permit state officials to hold aliens because of their unlawful presence. Rather, it permits them to hold those arrested based on probable cause for committing serious state-law felonies to ensure they will remain here to answer the charges. Plaintiffs-Appellants’ declaration that “[b]ut for their purported immigration violations, individuals subjected to Proposition 100 would be eligible for bail like any other defendant under Arizona law,” Corrected Brief of Appellants at 62, No. 11-16487 (Nov. 2, 2011), could just as easily be expressed as “but for their commission of state-law felonies, those unlawfully present in the United States would not be detained under Proposition 100.” Proposition 100 is not conflict preempted.
YII
The Arizona Legislature and Arizona voters passed the Proposition 100 laws to further the state’s legitimate and compelling interest in seeing that those accused of serious state-law crimes are brought to trial. At oral argument, counsel for both sides urged us to rule on the constitutional issues presented by passage and implementation of Arizona’s constitutional amendment based on the record presented to the district court. After reviewing the record, we are satisfied that Plaintiffs-Appellants have not succeeded in raising triable issues of fact as to whether Proposition 100 and its implementing procedures violate the substantive and procedural due process guarantees of the United States Constitution’s Fourteenth Amendment, the Excessive Bail Clause of the Eighth Amendment, and the Sixth Amendment right to counsel, nor whether the Proposition 100 laws are preempted by federal immigration law.
Accordingly, the judgment of the district court is AFFIRMED.

. A person arrested for a felony crime in Arizona must be taken before a judicial officer for an initial review to ascertain probable cause to justify the arrest (if made by a peace officer without an arrest warrant) and to make a preliminary determination as to whether the person will be detained or released on various conditions. Ariz. R.Crim. P. 4.1, 4.2. The task in Maricopa County is routinely handled by court commissioners. See Superior Court Criminal Department, The Judicial Branch of Arizona, Maricopa County, http://www.superiorcourt.maricopa.gov/ SuperiorCourt/CrimmalDepartment/ innovation.asp# a (last visited June 10, 2013).

. Simpson v. Owens, 207 Ariz. 261, 85 P.3d 478 (Ariz.Ct.App.2004); Segura v. Cunanan, 219 Ariz. 228, 196 P.3d 831 (Ariz.Ct.App.2008).

. The class was defined as "[a]ll persons who have been or will be ineligible for release on bond by an Arizona state court in Maricopa County pursuant to Section 22(A)(4) of the Arizona Constitution and A.R.S. § 13-3961(A)(5).”

. The Fifth Amendment claim is not before us on appeal.

. The dissent suggests that Plaintiffs-Appellants need not "prove that punishment was the sole or even the predominant purpose of the legislation” in order for us to hold that it is impermissibly punitive. Dissent at 1075, n. 2. Not only are the cases cited for this proposition not on point, but the dissent fails to acknowledge the presumption of constitutionality which we are required to apply. See Flemming v. Nestor, 363 U.S. 603, 617, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960) ("We observe initially that only the clearest proof could suffice to establish the unconstitutionality of a statute on [the ground that it is motivated by a punitive purpose].... [T]he presumption of constitutionality with which this enactment, like any other, comes to us forbids us lightly to choose that reading of the statute’s setting which will invalidate it over that which will save it. It is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void.”) (citation, alteration marks, and internal quotation marks omitted); Alaska Packers Ass'n v. Indus. Accident Comm’n, 294 U.S. 532, 543, 55 S.Ct. 518, 79 L.Ed. 1044 (1935) (applying "the presumption of constitutionality which attaches to every state statute”).

. The dissent compares the denial of bail in this context to the removal by the state of an unwed father's children after the death of their mother. We think it worth noting that an irrebuttable presumption that all unwed fathers are unsuitable parents is hardly in the same category as Arizona’s studied decision to withhold bail from those the government has shown by a proof evident/presumption great standard have committed Class 1 through 4 state-law felonies.

. See Ala. Const, art. I, § 16; Alaska Const, art. I, § 11; Ark. Const, art. 2, § 8; Cal. Const, art. I, § 12; Colo. Const, art. II, § 19; Conn. Const, art. I, § 8; Del. Const, art. I, § 12; Fla. Const, art. I, § 14 (categorical denial of bail to those charged "with a capital offense or an offense punishable by life imprisonment”); Idaho Const, art. I, § 6; Ill. Const, art. I, § 9 (categorical denial of bail to those charged with a capital offense or offense punishable by life imprisonment); Ind. Const, art. 1, § 17 (categorical denial of bail to those charged with "murder or treason”); Kan. Const. Bill of Rights § 9; Ky. Const. § 16; La. Const, art. I, § 18; Me. Const, art. I, § 10 (categorical denial of bail for “any of the crimes which now are, or have been denominated capital offenses since the adoption of the Constitution ... whatever the punishment of the crimes may be”); Mass. Gen. Laws ch. 276, § 20D (categorical denial of bail to those charged with a capital offense or offense punishable by life imprisonment); Mich. Const, art. I, § 15 (categorical denial of bail for charges of murder, treason, repeat violent felonies, and felonies committed while out on bail, probation, or parole for a prior violent felony); Minn. Const, art. I, § 7; Miss. Const, art. 3, § 29; Mo. Const, art. I, § 20; Neb. Const, art. I, § 9 (categorical denial of bail for murder, treason, and rape); Nev. Const, art. 1, § 7 (categorical denial of bail to those charged with a capital offense or offense punishable by life imprisonment); N.H.Rev.Stat. § 597:1-c (categorical denial of bail for any offense "punishable by up to life in prison”); N.J. Const, art. I, § 11; N.M. Const, art. II, § 13; N.D. Const, art. I, § 11; Ohio Const, art. I, § 9; Okla. Const, art. 2, § 8; Or. Const, art. I, § 14 (murder and treason); Pa. Const, art. I, § 14 (capital offenses or offenses punishable by life imprisonment); R.I. Const, art. I, § 9 (offenses punishable by life imprisonment, offenses involving dangerous weapons by defendants previously convicted of other offenses, and certain controlled substance offenses); S.C. Const, art. I, § 15 (capital offenses, offenses punishable by life imprisonment, and certain violent offenses); Tenn. Const, art. I, § 15; Utah Const, art. I, § 8 (capital offenses, felony offenses committed while out on bail, probation, or parole for prior felony offense); Wash. Const, art. I, § 20; Wyo. Const, art. 1, § 14.

. California’s constitution is illustrative:
A person shall be released on bail by sufficient sureties, except for:
... (b) Felony offenses involving acts of violence on another person, or felony sexual assault offenses on another person, when the facts are evident or the presumption great and the court finds based upon clear and convincing evidence that there is a substantial likelihood the person’s release would result in great bodily harm to others.”
Cal. Const, art. I, § 12.

. Citing Simpson, the New Hampshire Supreme Court upheld a similar categorical pretrial detention scheme in State v. Furgal, 161 N.H. 206, 13 A.3d 272 (2010). The court rejected the defendant's assertion that Salerno requires a court to consider the specific circumstances of each defendant’s risk of flight before denying bail. Id. at 279 (“Given this long history of bail permitting courts in a narrow category of cases to focus exclusively upon the evidence of the defendant’s guilt, the individualized inquiry for which the defendant argues cannot be said to be ‘implicit in the concept of ordered liberty.’ ”).

. The dissent complains that Arizona has failed to put forward “findings, studies, statistics or other evidence” demonstrating that illegal immigrants pose a heightened flight risk. Dissent at 1076. There is no requirement that a legislature support an intuitive proposition borne out by anecdotal evidence with statistical studies. Otherwise, any state law or local ordinance with an arguably punitive impact would require scientific studies to withstand a due process challenge. Moreover, the Supreme Court has previously acknowledged that there is support for the proposition that criminal aliens pose a greater flight risk. See Demore v. Kim, 538 U.S. 510, 519, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003) (noting that the record showed that “more than 20% of deportable criminal aliens failed to appear for their removal hearings”); cf. City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 51-52, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (finding that city was entitled to rely on the experiences of other cities and was not required to conduct new studies or gather independent evidence when enacting a zoning ordinance challenged on First Amendment grounds). ■
The record in 'this case includes committee hearing discussions on the “numerous examples of serious and violent criminals that [the] Maricopa County .Attorney’s Office has prosecuted in the past, that have escaped justice because they have either slipped back across the border after they’ve been released on bail or they’ve been deported by the federal government after they were released on bail.... ” If the dissent is not satisfied by the anecdotal evidence presented in the Arizona Legislature on this subject, it is unclear why it is comfortable with the anecdotal evidence in the record of “examples of undocumented immigrants who were arrested before Proposition 100, granted bail and appeared at their court dates and trials.” Dissent at 1077.

. Demore upheld detention without bail of aliens subject to deportation — an administrative proceeding without the more substantial risks inherent when facing a serious felony criminal prosecution. Furthermore, Demore upheld these detentions pursuant to 8 U.S.C. § 1226(c) without requiring individualized determinations of flight risk or dangerousness. 538 U.S. at 515-16, 123 S.Ct. 1708. If the federal government can detain aliens subject to deportation for months while their administrative proceedings are pending, Arizona is within constitutional bounds if it chooses to incarcerate pre-trial those illegal aliens it has arrested on probable cause for committing serious felony offenses.

. The Section 287(g) program allows state and local law enforcement entities to enter into partnerships with U.S. Immigration and Customs Enforcement ("ICE”) in order to receive delegated authority to assist in immigration enforcement within their respective jurisdictions. Under the program, local officers are trained to enforce immigration law as authorized through Section 287(g) of the Immigration and Nationality Act. See Fact Sheet: Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act, U.S. Department of Homeland Security, http://www.ice.gov/news/library/factsheets/287 g.htm (last visited June 10, 2013).

. We note that this issue could be resolved if the commissioners would inform the arres-tees of their right to a Simpson/Segura hearing at the initial appearance. Although perhaps advisable, we nonetheless conclude that the failure of the commissioners to do so as a standard practice does not amount to a due process violation. Once counsel appear to represent arrestees, these lawyers will presumably know and request a hearing when they believe it appropriate to do so.

. United States Citizenship and Immigration Services processes applications to adjust the immigration status of aliens present in the United States, including adjustments through the issuance of Green Cards granting Lawful Permanent Resident Status. See generally U.S. Immigration Online, U.S. Citizenship and Immigration Services, http://www.immigration direct.com/ (last visited June 10, 2013).

. "VR” here refers to Voluntary Departure (or Removal), a benefit extended'to illegal aliens who are permitted to waive deportation proceedings by agreeing to immediately leave the United States upon apprehension by Immigration and Customs Enforcement officers such as the United States Border Patrol. See Glossary, U.S. Citizenship and Immigration Services, http://www.uscis.gov/portal/site/uscis/ menuitem.5af9bb95919f35e66f614176543f6d 1 a/? vgnextoid=9e258fa29935f010 VgnV CM lOOOOOOecdl 90aRCRD &vgnextchannel=b 328194d3e88d010VgnVCM10000048f3d6al RCRD (last visited June 10, 2013).